PER CURIAM.
This case is before the Court on appeal by Michael Reynolds from an order denying a motion to vacate sentences of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from sentences of death, this Court has jurisdiction under article V, section 3(b)(1), of the Florida Constitution. For the reasons explained below, we affirm the circuit court's denial of relief.
*813 FACTUAL AND PROCEDURAL BACKGROUND
We detailed the underlying crimes in Reynolds's direct appeal. Reynolds v. State (Reynolds I ), 934 So.2d 1128, 1135-39 (Fla. 2006). For the purposes of this proceeding, it is relevant that Reynolds was convicted for the first-degree murders of Robin and Christina Razor, along with the second-degree murder of Danny Privett and the burglary of a dwelling with armed battery. Id. at 1135.
At the penalty phase, Reynolds waived his right to present mitigating evidence. Outside the presence of the jury, Reynolds was advised of his right to present mitigation evidence, but he waived that right after conferring with counsel at length. Moreover, the trial court conducted a thorough colloquy to ensure that Reynolds understood the rights that he was waiving and even recessed for one day, giving Reynolds the opportunity to fully consider his decision. Reynolds v. State (Reynolds II ), 99 So.3d 459, 493-97 (Fla. 2012). Concerning his waiver, Reynolds explained his decision:
I don't want to present a mitigating case here because there's no such thing. I mean, Your Honor, it's a waste of time because I have [no mitigators ]. I've been locked up all my life.
....
... I have no mitigating , I have nothing that's gonna dictate against my record, and I know that the final outcome of this is that I'm gonna go to death row, and I would wish, if you would, and if y'all would honor that and please let me get this done and get up the road. And that's about the best way I can say it, Your Honor. I'm ready to go.
Id. at 493-94 (alteration in original). Trial counsel swore in an affidavit that Reynolds waived mitigation, "at least in part, because he did not think there was any chance of convincing six jurors to vote for life, and did not want to subject his sisters to the stress of testifying before a jury."
In a pretrial motion, Reynolds moved for the use of a special verdict form containing jury factfinding on aggravation. The trial court denied that motion. Moreover, in reading the instructions, the trial court informed the jury that "the final decision as to what punishment shall be imposed is the responsibility of the judge." Yet, the trial court explained that it could reject their advisory recommendation "only if the facts [were] so clear and convincing that virtually no reasonable person could differ." The trial court also informed the jury that "the law require[d] the court to give great weight" to the recommendation.
After deliberation, the jury unanimously recommended death on each count of first-degree murder.
At a Spencer[1] hearing, trial counsel filed mitigation with the trial court that it would have presented at the penalty phase-absent Reynolds's waiver of that right. The trial court conducted the Spencer hearing. As a result, the trial court found the following aggravators proven beyond a reasonable doubt and afforded great weight to each: for the murder of Robin Razor, the trial court found four aggravators-(1) Reynolds's previous conviction for another capital felony or felony involving use or threat of violence to a person; (2) Reynolds committed the murder while engaged in, or the accomplice to, or attempting to commit, a burglary; (3) the murder was committed for the purpose of avoiding a lawful arrest; and (4) the murder was especially heinous, atrocious, or cruel (HAC)-and for the murder of Christina Razor, the *814 trial court found the same four aggravators, along with a fifth aggravator-the victim of the murder was a person less than twelve years old. On each count of first-degree murder, the trial court found the existence of four statutory mitigators and afforded little weight to each: (1) Reynolds was gainfully employed; (2) Reynolds manifested appropriate courtroom behavior; (3) Reynolds cooperated with law enforcement; and (4) Reynolds had a difficult childhood, including various subparts.[2] In accordance with Muhammad v. State , 782 So.2d 343 (Fla. 2001), the trial court did not afford great weight to the unanimous jury recommendation because the jury did not hear the mitigation.[3] After weighing the substantial aggravation against the minimal mitigation, the trial court sentenced Reynolds to death for the murders of Robin and Christina Razor.
Reynolds appealed his convictions and sentences to this Court, and we affirmed. Reynolds I , 934 So.2d at 1161. His petition for writ of certiorari was denied by the United States Supreme Court on January 8, 2007. Reynolds v. Florida , 549 U.S. 1122, 127 S.Ct. 943, 166 L.Ed.2d 721 (2007). Pursuant to Florida Rule of Criminal Procedure 3.851, Reynolds filed his initial motion for postconviction relief, raising several claims. After an evidentiary hearing, the circuit court denied each claim, which we affirmed along with denying his petition for writ of habeas corpus. Reynolds II , 99 So.3d at 501.
Following Hurst v. State (Hurst ), 202 So.3d 40 (Fla. 2016), cert. denied , --- U.S. ----, 137 S.Ct. 2161, 198 L.Ed.2d 246 (2017), Reynolds filed the instant successive motion to vacate his sentences of death. After a case management conference on March 2, 2017, the circuit court denied Reynolds's successive motion in a subsequent written order.
This appeal follows.
ANALYSIS
In this successive postconviction motion, Reynolds raises two claims: (1) his death sentences violate the Sixth Amendment in light of Hurst and Hurst v. Florida , --- U.S. ----, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016) ; and (2) his death sentences violate the Eighth Amendment under Caldwell v. Mississippi , 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and must be vacated in light of Hurst , Hurst v. Florida , and Perry v. State , 210 So.3d 630 (Fla. 2016). These issues present purely legal questions, which we review de novo. E.g. , Mosley v. State , 209 So.3d 1248, 1262 (Fla. 2016).
Sixth Amendment Hurst Claim
Reynolds contends that the circuit court erred in denying his successive motion for postconviction relief pursuant to Hurst under the Sixth Amendment.
Reynolds's death sentences became final when the Supreme Court denied his writ of certiorari on January 8, 2007. Reynolds v. Florida , 549 U.S. 1122, 127 S.Ct. 943, 166 L.Ed.2d 721. Because the sentences became final after Ring v. Arizona , 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Hurst applies retroactively to this case. E.g. , Mosley , 209 So.3d at 1274-83 (applying Hurst retroactively to a post- Ring , postconviction defendant). In Hurst , we held "that in addition to unanimously finding the existence of any aggravating factor, the jury must also unanimously find that the aggravating factors are sufficient *815 for the imposition of death and unanimously find that the aggravating factors outweigh the mitigation before a sentence of death may be considered by the judge." 202 So.3d at 54. Further, we concluded that Hurst error is capable of harmless error review. Id. at 66-68 ; see, e.g. , King v. State , 211 So.3d 866, 889 (Fla. 2017). Accordingly, we must decide whether Reynolds's Hurst error was harmless beyond a reasonable doubt. E.g. , Davis v. State , 207 So.3d 142, 174 (Fla. 2016).
In Hurst , we explained our standard for harmless error review:
Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a Hurst v. Florida error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for the imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:
The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.
"The question is whether there is a reasonable possibility that the error affected the [sentence]."
202 So.3d at 68 (citations omitted) (alteration in original) (quoting State v. DiGuilio , 491 So.2d 1129, 1137-38 (Fla. 1986) ).[4] Under this standard, our harmless error analyses in the wake of Hurst have varied due to the individualized, case-by-case approach. However, we have conducted these analyses within the same general framework described below.
Preliminarily, we look to whether the jury recommendation was unanimous. See, e.g. , Kaczmar v. State , 228 So.3d 1, 9 (Fla. 2017) ; Jones v. State , 212 So.3d 321, 343-44 (Fla. 2017) ; King , 211 So.3d at 890 ; Davis , 207 So.3d at 174-75. Here, the jury recommendation was unanimous. Although Reynolds's jury was instructed that it was "not necessary that the advisory sentence ... be unanimous," it nonetheless returned two unanimous death sentences. See Davis , 207 So.3d at 174-75. Reynolds attempts to analogize his case to nonunanimous decisions such as Johnson v. State , 205 So.3d 1285 (Fla. 2016). That comparison falls flat. We have been abundantly clear that there is a critical distinction between unanimous and nonunanimous jury recommendations as they pertain to Hurst error. E.g. , Davis , 207 So.3d at 174 ("[W]e emphasize the unanimous jury recommendations of death."). Therefore, Reynolds's case is fundamentally different from any nonunanimous cases where Hurst relief was appropriate.
*816 Yet a unanimous recommendation is not sufficient alone; rather, it "begins a foundation for us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." King , 211 So.3d at 890. Hence, we look to other factors such as the jury instructions. Kaczmar , 228 So.3d at 9 ; King , 211 So.3d at 890-91 ; Davis , 207 So.3d at 174-75.
A review of the record reveals that the trial court instructed Reynolds's jury using Florida Standard Jury Instruction (Criminal) 7.11. We have rejected similar Hurst claims where defendants received Standard Jury Instruction 7.11. Kaczmar , 228 So.3d at 9 ; Knight v. State , 225 So.3d 661, 682-83 (Fla. 2017) ; Davis , 207 So.3d at 174. Moreover, a review of Kaczmar , Knight , and Davis demonstrates that the critical instructions given in those cases were similar to those given here. The trial court here instructed the jury, "It is your duty to ... render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist." See Davis , 207 So.3d at 174 ("The instructions that were given informed the jury that it needed to determine whether sufficient aggravators existed and whether the aggravation outweighed the mitigation before it could recommend a sentence of death."). Even though Reynolds's jury was instructed that unanimous recommendations were not required at that time, the jury still returned two unanimous death sentence recommendations, similar to the circumstances that we upheld in Kaczmar , Knight , and Davis . See Knight , 225 So.3d at 683 ("Knight's 'jury was not informed that the finding that sufficient aggravating circumstances outweighed the mitigating circumstances must be unanimous, and ... the jury did, in fact, unanimously recommend death.' " (quoting Davis , 207 So.3d at 174-75 ) (alteration in original) ).
Absent from Reynolds's jury instructions was a mercy instruction, which we used to support our harmless error conclusions in Davis and Kaczmar .[5] Nevertheless, we have held that the failure to give a mercy instruction alone does not necessarily make a Hurst error harmful. Knight , 225 So.3d at 683 ("[T]he Davis jury 'was instructed that it was not required to recommend death even if the aggravators outweighed the mitigators,' while Knight's jury was not. Nonetheless, we believe that Knight's jury received substantially the same critical instructions as Davis's jury." (citation omitted) ). Moreover, in his briefs, Reynolds fails to mention that the mercy instruction was not added to Standard Jury Instruction 7.11 until October 2009-before Davis and Kaczmar's penalty phases but after Reynolds's penalty phase in 2003. In re Std. Jury Instr. in Crim. Cases-Report No. 2005-2 , 22 So.3d 17, 22, 35 (Fla. 2009) ; Davis , 207 So.3d at 155 (penalty phase in 2011) ; Kaczmar , 228 So.3d at 6 (second penalty phase in 2013). For these reasons, and in accordance with our decisions in Davis , Kaczmar , and Knight , we can conclude that Reynolds's "jury unanimously made the requisite factual findings to impose death before it issued the unanimous recommendations." Davis , 207 So.3d at 175.
Next, we review the aggravators and mitigators. See King , 211 So.3d at 891-92 ; Davis , 207 So.3d at 175. Before doing so, *817 however, there is an important distinction between this case and Davis that must be addressed: Reynolds waived his right to present mitigation, while Davis did not. At first blush, this may appear problematic, but we have concluded that a defendant's waiver of the right "to present mitigation to the jury during the penalty phase has no bearing" on a cognizable Hurst claim. Jones , 212 So.3d at 343 n.3. In Jones , we reasoned that the refusal to present mitigation could not give rise to a subsequent Hurst claim:
As previously stated, Jones's waiver of that right was valid, and he "cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence." Mullens v. State , 197 So.3d 16, 40 (Fla. 2016), cert. denied , [--- U.S. ----], 137 S.Ct. 672 [196 L.Ed.2d 557] (2017).
Id. Following the reasoning of Mullens , Reynolds-similar to Jones and Mullens-waived his right to jury factfinding on mitigation under the Sixth Amendment. Because he waived that right, he cannot now claim a harmful error for the lack of jury factfinding that he knowingly waived. See Mullens , 197 So.3d at 40. Prior to Reynolds's penalty phase, trial counsel, along with the trial court, attempted to influence Reynolds to reverse his decision and ensured that he was examined by a mental health expert. Reynolds II , 99 So.3d at 485 n.9, 493-94. Nonetheless, Reynolds chose to waive his right to present mitigation because he considered it a "waste of time" as he had no mitigation. Id. at 493. Reynolds now claims that his decision was the result of his belief that he could not convince six jurors to vote for life and, as trial counsel noted, Reynolds's desire not to "subject his sisters to the stress of testifying before a jury." Yet the reason that Reynolds waived mitigation is not pertinent to this analysis under Mullens and Jones . Instead, the dispositive fact concerning Reynolds's waiver is that he knowingly and intelligently waived his right to jury factfinding on mitigation. See Mullens , 197 So.3d at 39-40 ("[W]e fail to see how Mullens, who was entitled to present mitigating evidence to a jury as a matter of Florida law even after he pleaded guilty and validly waived that right , can claim error.").
Also, there was not a complete absence of mitigation. Despite his waiver, the trial court considered Reynolds's limited mitigation. As a result, the trial court found four mitigators and afforded little weight to each. Furthermore, Reynolds's waiver was factually less problematic than other waivers that we have upheld. For instance, in Kaczmar , a jury returned an eleven-to-one recommendation for death after hearing mitigation. 228 So.3d at 5. However, a second penalty phase jury returned a unanimous recommendation on remand after the defendant waived mitigation. Id. at 6. Despite this fact, we found the Hurst error harmless and denied relief. Id. at 9. It follows that Reynolds's decision to waive mitigation does not constitute a per se harmful Hurst error. See Jones , 212 So.3d at 343 & n.3 ; Kaczmar , 228 So.3d at 9.[6]
Turning back to the comparison between aggravators and mitigators, we have stated that "it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that *818 outweighed the mitigating circumstances." Davis , 207 So.3d at 174. Here, there were four and five aggravators found in the murders of Robin and Cristina Razor, respectively. Although the trial court found certain mitigating factors, those circumstances could not have affected the jury because Reynolds waived presentation of mitigation to his jury. Even leaving aside the aggravators that could arguably require a factual finding by the jury, the aggravation here necessarily outweighed the mitigation. Consequently, there is no reasonable dispute as to whether the aggravation outweighed the mitigation, and the jury correspondingly returned death recommendations by twelve-to-zero votes.
Finally, we look at the facts of the case. See King , 211 So.3d at 891-92. Here, as Privett relieved himself, Reynolds smashed his head with a cinder block. Reynolds I , 934 So.2d at 1135-36, 1157. Then, Reynolds proceeded to kill Christina and Robin Razor-an eleven-year-old girl and her mother-by beating and stabbing them to death because, in Reynolds's words, "with [his] record [he] couldn't afford to leave any witnesses." Id. The "egregious facts of this case" firmly buttress the conclusion that the Hurst error was harmless beyond a reasonable doubt. See, e.g. , Davis , 207 So.3d at 175.
Accordingly, we affirm and conclude that "this is one of those rare cases in which the Hurst error was harmless beyond a reasonable doubt." King , 211 So.3d at 890 ; see also Knight , 225 So.3d at 683 ; Davis , 207 So.3d at 175.
Eighth Amendment Caldwell Claim
Reynolds also contends that the circuit court erred in denying his successive motion for postconviction relief pursuant to Hurst under the Eighth Amendment. Specifically, Reynolds argues that his sentences violated the Eighth Amendment under Caldwell .[7] To date, we have not expressly addressed a Caldwell challenge to Standard Jury Instruction 7.11 brought under Hurst[8] ; thus, we must determine if a legal basis exists for these types of " Hurst -induced Caldwell claims." We have labeled these as Hurst -induced Caldwell claims because that distills the essence of the challenge: Hurst and its progeny render the previous Standard Jury Instruction violative of Caldwell .[9]
*819 Relevant Legal Background
As an introductory matter, it is necessary to review the jurisprudential development of this issue, which began in Florida long before Caldwell . In Blackwell v. State , 76 Fla. 124, 79 So. 731 (1918), we held that it was reversible error for a prosecutor to make comments that "lessen [a jury's] estimate of the weight of their responsibility, and cause them to shift it from their consciences to the Supreme Court." Id. at 736. There, the prosecutor stated, "If there is any error committed in this case, the Supreme Court, over in the capital of our state, is there to correct it, if any error should be done." Id. at 735. Despite an objection, the trial court refused to correct that statement and expressly approved of it, which we reversed. Id. at 735-36. We noted that the "purpose and effect of this remark was to suggest to the jury that they need not be too greatly concerned about the result of their deliberation" because this Court would be waiting in the wings to correct any errors. Id.
Years later, in Pait v. State , 112 So.2d 380, 383-86 (Fla. 1959), we reached a similar outcome on analogous facts. Among other statements, the prosecutor there told the jury, "This is the last time the People of this State will try this case in this court. Because whatever you do, the People have no right of appeal. They are done. This is their day. But he may have another day; he has an appeal." Id. at 383. We noted that the prosecutor's comment "incorrectly stated the law" and was a type of situation when a statement "so deeply implant[ed] seeds of prejudice or confusion that even in the absence of a timely objection at the trial level it [became] the responsibility of this court to point out the error" and reverse. Id. at 384. We concluded that it was impossible for us, as an appellate court, to determine whether the "improper and erroneous" comments persuaded the jury; thus, we could not "say that they were non-prejudicial and harmless." Id. at 386.
Taken together, Blackwell and Pait in some ways represented in Florida what Caldwell would become nationally. Some legal commentators have noted as much, " Blackwell and Pait were Caldwell before Caldwell was Caldwell ." Craig Trocino & Chance Meyer, Hurst v. Florida's Ha'p'orth of Tar: The Need to Revisit Caldwell, Clemons, and Proffitt, 70 U. Miami. L. Rev. 1118, 1134 (2016). One critical distinction, however, is that our cases did not "condemn false prosecutorial [and judicial] statements under the Eighth Amendment analysis employed in Caldwell ." Sawyer v. Smith , 497 U.S. 227, 239, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). It is clear that, even in the absence of Caldwell , Florida has a long history of ensuring that jurors understand their role and are not misled as to their responsibility. Yet Caldwell represented something different than Blackwell and Pait because it placed the Eighth Amendment imprimatur upon those general principles. See Sawyer , 497 U.S. at 238-40, 110 S.Ct. 2822 ; Caldwell , 472 U.S. at 328-30, 105 S.Ct. 2633.
In Caldwell , the Supreme Court ruled that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29, 105 S.Ct. 2633. On facts nearly identical to Blackwell , the Supreme Court took issue with a Mississippi prosecutor's comments to the jury mentioning automatic review by their high court:
Now, they would have you believe that you're going to kill this man and they know-they know that your decision is not the final decision. My God, how *820 unfair can you be? Your job is reviewable. They know it....
....
... They said 'Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically , and I think it's unfair and I don't mind telling them so.
Id. at 325-26, 105 S.Ct. 2633 (emphasis added). The Supreme Court reversed the death sentence because the prosecutor "sought to minimize the jury's sense of responsibility," and the Court could not "say that this effort had no effect on the sentencing decision," which did "not meet the standard of reliability that the Eighth Amendment requires." Id. at 341, 105 S.Ct. 2633. The Court reasoned that shifting a jury's sense of responsibility to appellate courts could create "substantial unreliability as well as bias in favor of death sentences." Id. at 330, 105 S.Ct. 2633. Such indications to the jury could persuade jurors to rely on appellate courts to correct their errors, therefore completely depriving defendants of their right to a determination of the appropriateness of death due to the nature of appellate review. Id. at 330-33, 105 S.Ct. 2633.
Justice O'Connor cast the deciding fifth vote in Caldwell . Her concurring in part opinion explained a disagreement with the Court's analysis of California v. Ramos , 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). Caldwell , 472 U.S. at 341-43, 105 S.Ct. 2633. She wrote,
In my view, the prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility. I agree there can be no "valid state penological interest" in imparting inaccurate or misleading information that minimizes the importance of the jury's deliberations in a capital sentencing case.
Id. at 342, 105 S.Ct. 2633. According to Justice O'Connor, the Court read Ramos too broadly, and she concluded that Ramos did not preclude a jury from hearing accurate instructions about postsentencing procedures. Caldwell , 472 U.S. at 342, 105 S.Ct. 2633. Because the Mississippi Supreme Court applied a presumption of correctness to the jury verdict and could only overturn it under limited circumstances, Justice O'Connor opined that misleading the jury to believe that the appellate court would make the final decision was inaccurate. Id. at 342-43, 105 S.Ct. 2633. However, she noted that if "a State conclude[s] that the reliability of its sentencing procedure is enhanced by accurately instructing the jurors on the sentencing procedure, including the existence and limited nature of appellate review," then Ramos would not "foreclose a policy choice in favor of jury education." Caldwell , 472 U.S. at 342, 105 S.Ct. 2633.
Following Caldwell , the status of Florida jury recommendations as "advisory" was somewhat unsettled. We conclusively held that Florida's sentencing scheme was distinguishable from the procedure at issue in Caldwell , that jury recommendations in Florida were "merely advisory," and that it was not a Caldwell violation to refer to the jury as "advisory" as long as "the jury's role was adequately portrayed and they were in no way misled as to the importance of their role." Pope v. Wainwright , 496 So.2d 798, 805 (Fla. 1986). Meanwhile, various opinions from the Eleventh Circuit Court of Appeals questioned *821 our determination. For instance, in Adams v. Wainwright (Adams I ), 804 F.2d 1526 (11th Cir. 1986), partially vacated and modified sub nom. Adams v. Dugger (Adams II ), 816 F.2d 1493 (11th Cir. 1987), rev'd , 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989), the Eleventh Circuit held that Caldwell applied to Florida's then-existing sentencing scheme and that certain statements made by a trial court constituted a Caldwell violation by creating "an intolerable danger that the jury's sense of responsibility for its advisory sentence was diminished." Adams I , 804 F.2d at 1529. In Combs v. State , 525 So.2d 853, 856 (Fla. 1988), we again distinguished the sentencing scheme at issue in Caldwell , thus finding Caldwell inapplicable in Florida. Moreover, we reiterated our understanding-at the time-that the standard jury instruction referring to the jury's recommendation as "advisory" and the trial court as the final sentencer comported with the death penalty statute and properly described the jury's role. Combs , 525 So.2d at 856-57. We looked to the plain language of the statute to support our conclusion:
(2) ADVISORY SENTENCE BY THE JURY.-After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court , based upon the following matters: ....
(3) FINDINGS IN SUPPORT OF SENTENCE OF DEATH.-Notwithstanding the recommendation of a majority of the jury, the court , after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death ....
Id. at 857 (quoting § 921.141(2) - (3), Fla. Stat. (1985) ).[10] Further, we stated that it was not our intention to circumvent the clear statutory directive for an advisory jury role when we held that a trial court may override a jury's life sentence only if the "facts are 'so clear and convincing that virtually no reasonable person could differ.' " Id. (quoting Tedder v. State , 322 So.2d 908, 910 (Fla. 1975) ). We stated much of the same in Grossman v. State , 525 So.2d 833 (Fla. 1988), receded from on other grounds by Franqui v. State , 699 So.2d 1312, 1319-20 (Fla. 1997), and there specifically rejected the argument that Tedder created a rule where "the weight given to the jury's advisory recommendation [wa]s so heavy as to make it the de facto sentence." Id. at 840. Later, in companion opinions, the Eleventh Circuit found Caldwell error in Mann v. Dugger , 844 F.2d 1446 (11th Cir. 1988) (en banc), but no error in Harich v. Dugger , 844 F.2d 1464 (11th Cir. 1988) (en banc).[11] Those decisions made clear that the Eleventh Circuit at that time focused primarily on whether the comments minimized the jury's sense of responsibility and whether the trial court "sufficiently correct[ed] the impression." Mann , 844 F.2d at 1456 (quoting McCorquodale v. Kemp , 829 F.2d 1035, 1037 (11th Cir. 1987) ); see Harich , 844 F.2d at 1477-78 (Tjoflat, J., concurring specially).
In the midst of this confusion, the Supreme Court reviewed Adams II and issued its decision in Dugger v. Adams (Adams III ), 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). In Adams III , the Supreme Court did not reach the merits of the Caldwell issue, reversing the Eleventh *822 Circuit instead on procedural bar grounds. Adams III , 489 U.S. at 407-08, 408 n.4, 109 S.Ct. 1211. The Court thus did "not decide whether in fact the jury as instructed in this case was misinformed of its role under Florida law," and left the question open. Id. at 408 n.4, 109 S.Ct. 1211.
A few years later, the Supreme Court clarified its Caldwell holding in Romano v. Oklahoma , 512 U.S. 1, 8-10, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). There, the defendant was tried separately for two murders. Id. at 3, 114 S.Ct. 2004. The first trial resulted in a death sentence. Id. Evidence of the first death sentence was introduced and considered by the jury in the second trial, which resulted in a second death sentence. Id. During appeal of the second trial, the first death sentence was vacated and that case remanded for a new trial. Id. at 5, 114 S.Ct. 2004. With his second death sentence still on appeal, the defendant argued, in part, that introduction of a prior death sentence undermined the second jury's "sense of responsibility for determining the appropriateness of the death penalty." Id. at 3, 114 S.Ct. 2004. The Supreme Court disagreed. Id. In its analysis, the Court clarified that Justice O'Connor's position in Caldwell , as set forth in her concurring in part opinion, was controlling over the plurality view there:
Accordingly, we have since read Caldwell as "relevant only to certain types of comment-those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Darden v. Wainwright , 477 U.S. 168, 184 n.15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Thus, "[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." Dugger [III ], 489 U.S. [at] 407 [109 S.Ct. 1211].
Romano , 512 U.S. at 9, 114 S.Ct. 2004 (first alteration in original). Despite the fact that the first death sentence was vacated after his second jury considered it as evidence, the Supreme Court still found that the "infirmity identified in Caldwell [wa]s simply absent in this case: Here, the jury was not affirmatively misled regarding its role in the sentencing process." Romano , 512 U.S. at 9, 114 S.Ct. 2004.
In the aftermath of Romano , the Eleventh Circuit brought its understanding of Caldwell in line with our interpretation of its application to Florida. Davis v. Singletary , 119 F.3d 1471 (11th Cir. 1997). In Davis , the Eleventh Circuit expressly overruled any implication in Mann and Harich "that a prosecutorial or judicial comment or instruction could constitute Caldwell error even if it was a technically accurate description under state law of the jury's actual role." Id. at 1482. The court noted that such "implications cannot survive the Supreme Court's subsequent holdings" in Romano . Davis , 119 F.3d at 1482. As a result, the Eleventh Circuit held
that the references to and descriptions of the jury's sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under Caldwell . Those references and descriptions are not error, because they accurately characterize the jury's and judge's sentencing roles under Florida law.
Id. at 1482.
With the relevant history in mind, we now address the claim at issue. The basic argument for such claims follows: after Hurst , jury verdicts are no longer advisory and must be unanimous; thus, a jury that was not instructed as such before Hurst did not understand its role or feel the *823 weight of its sentencing responsibility. Due to the different considerations for these claims in relation to Ring , pre- Ring and post- Ring claims will be discussed separately.
Pre-Ring Caldwell Claims
After Romano and before Ring , Florida law was settled that it was not a Caldwell error to refer to jury recommendations as "advisory" and the trial court as the final sentencer. E.g. , Card v. State , 803 So.2d 613, 628 (Fla. 2001) ; Sireci v. State , 773 So.2d 34, 40 nn.9 & 11 (Fla. 2000) ; Teffeteller v. Dugger , 734 So.2d 1009, 1026 (Fla. 1999) ; Brown v. State , 721 So.2d 274, 283 (Fla. 1998) ; Burns v. State , 699 So.2d 646, 655 (Fla. 1997) ; Johnson v. State , 660 So.2d 637, 647 (Fla. 1995) ; see also Davis , 119 F.3d at 1482. Similarly, before Ring there was no authoritative indication that there were any constitutional infirmities with Florida's capital sentencing scheme. See Walton v. Arizona , 497 U.S. 639, 647-48, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), abrogated by Ring , 536 U.S. at 609, 122 S.Ct. 2428 ; Hildwin v. Florida , 490 U.S. 638, 639-41, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), abrogated by Hurst v. Florida , 136 S.Ct. at 623 ; Spaziano v. Florida , 468 U.S. 447, 462-65, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), abrogated by Hurst v. Florida , 136 S.Ct. at 623 ; Proffitt v. Florida , 428 U.S. 242, 259-60, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Therefore, there cannot be a pre- Ring , Hurst -induced Caldwell challenge to Standard Jury Instruction 7.11 because the instruction clearly did not mislead jurors as to their responsibility under the law; therefore, there was no Caldwell violation. See Romano , 512 U.S. at 9, 114 S.Ct. 2004. The Standard Jury Instruction cannot be invalidated retroactively prior to Ring simply because a trial court failed to employ its divining rod successfully to guess at completely unforeseen changes in the law by later appellate courts.
Moreover, Ring became the cutoff that we set for any and all Hurst -related claims. Hitchcock v. State , 226 So.3d 216, 217 (Fla.), cert. denied , --- U.S. ----, 138 S.Ct. 513, 199 L.Ed.2d 396 (2017) ; see, e.g. , Asay v. State , 210 So.3d 1, 15-22 (Fla. 2016). As a practical matter, a Hurst -induced Caldwell claim cannot be more retroactive than Hurst because the rights announced in Hurst serve as the basis for this type of Caldwell claim-the two are inextricably intertwined for the purposes of this challenge. If rights are not retroactive prior to Ring , then any pre- Ring claim based on those rights plainly cannot stand.
Post-Ring Caldwell Claims
Ring presented the first indication that Florida's then-existing death sentencing scheme may be unconstitutional; so, pre- Ring and post- Ring Hurst -induced Caldwell claims are properly addressed separately. Nevertheless-for these claims-Ring amounts to a distinction without a difference. Similar to the discussion above, neither Ring nor Hurst provides bases for Caldwell challenges to the standard jury instruction given in the interim, between 2002 and 2016, because these challenges cannot withstand the Supreme Court's holding in Romano. See 512 U.S. at 9, 114 S.Ct. 2004.
To be sure, following Ring , various members of this Court called into question the constitutionality of Florida's death scheme, going so far as to specifically recommend that the standard jury instruction be revised pursuant to Caldwell in light of Ring . See, e.g. , Bottoson v. Moore , 833 So.2d 693, 731-34 (Fla. 2002) (Lewis, J., concurring in result only). Despite this recognition, a majority never conclusively answered Ring 's effect on Florida's death scheme. See Jackson v. State , 213 So.3d 754, 781 (Fla. 2017) ;
*824 Johnson v. State , 904 So.2d 400, 406-07 (Fla. 2005) (leaving the question open while denying retroactive application of Ring to postconviction defendants). In plurality opinions, Bottoson and King v. Moore , 831 So.2d 143 (Fla. 2002), we "concluded that Ring did not apply to Florida because the Supreme Court had previously affirmed Florida's capital sentencing process." Jackson , 213 So.3d at 781. And, "[a]lthough neither Bottoson nor King constituted majority decisions that represented a clear rule of law from this Court, the ultimate result was that Ring was never applied in this State." Id. It was not until Hurst v. Florida that Ring was decisively applied to Florida's sentencing scheme. Hurst v. Florida , 136 S.Ct. at 621-22.
Because we never applied Ring to Florida's scheme, that case did not change our understanding of the jury's role as advisory and it continued as such.[12] In the meantime, we held that the standard jury instruction neither denigrated the jury's role nor violated Caldwell nearly every year between Ring and Hurst v. Florida . See, e.g. , Davis v. State , 136 So.3d 1169, 1201 (Fla. 2014) ; Foster v. State , 132 So.3d 40, 75 (Fla. 2013) ; Patrick v. State , 104 So.3d 1046, 1064 (Fla. 2012) ; Barwick v. State , 88 So.3d 85, 108-09 (Fla. 2011) ; Phillips v. State , 39 So.3d 296, 304 (Fla. 2010) ; Reese v. State , 14 So.3d 913, 920 (Fla. 2009) ; Jones v. State , 998 So.2d 573, 590 (Fla. 2008) ; Barnhill v. State , 971 So.2d 106, 117 (Fla. 2007) ; Miller v. State , 926 So.2d 1243, 1257 (Fla. 2006) ; Rodriguez v. State , 919 So.2d 1252, 1280 (Fla. 2005) ; Globe v. State , 877 So.2d 663, 673-74 (Fla. 2004) ; Griffin v. State , 866 So.2d 1, 14 (Fla. 2003).[13] Therefore, Romano applies with equal force to these post- Ring Caldwell claims. The mere contention that Standard Jury Instruction 7.11 referred to the jury as "advisory" and the trial court as the final sentencer cannot constitute a Caldwell violation because it fails to "show that the remarks to the jury improperly described the role assigned to the jury by local law." Romano , 512 U.S. at 9, 114 S.Ct. 2004 (quoting Adams III , 489 U.S. at 407, 109 S.Ct. 1211 ). Florida law, as it existed between 2002 and 2016, was settled that the standard jury instruction "fully advise[d] the jury of the importance of its role, correctly state[d] the law, d[id] not denigrate the role of the jury and d[id] not violate Caldwell ." Patrick , 104 So.3d at 1064 (quoting Jones , 998 So.2d at 590 ).[14] In Romano , despite the fact that the first death sentence, which the second jury relied *825 on as evidence, was later vacated, the Supreme Court reasoned that there was no Caldwell violation because the "evidence at issue was neither false at the time it was admitted, nor did it even pertain to the jury's role." Romano , 512 U.S. at 9, 114 S.Ct. 2004. Therefore, a Caldwell claim based on the rights announced in Hurst and Hurst v. Florida cannot be used to retroactively invalidate the jury instructions that were proper at the time under Florida law. See Romano , 512 U.S. at 9, 114 S.Ct. 2004 ; Caldwell , 472 U.S. at 342-43, 105 S.Ct. 2633 (O'Connor, J., concurring in part). Caldwell , as interpreted by Romano , ensures that jurors understand their actual sentencing responsibility; it does not indicate that jurors must also be informed of how their responsibilities might hypothetically be different in the future, should the law change.[15]
Furthermore, the specific concerns voiced by the Supreme Court in Caldwell are curtailed when applied to these Hurst -induced Caldwell claims. See Caldwell , 472 U.S. at 330-33, 105 S.Ct. 2633. Specifically, most of the Court's reasoning in Caldwell stemmed from the fear that jurors would delegate their sentencing responsibility to appellate courts. See id. Conversely, under Florida's previous standard jury instruction, any fear would relate to jurors delegating their responsibility to trial courts rather than appellate courts. Calling the recommendations "advisory" and the trial court as the final sentencer is certainly less problematic than the references to appellate review in Caldwell , Blackwell , and Pait because, unlike appellate courts, trial courts are positioned to make factual findings, which they do every day.[16] While denying the retroactivity of Ring , the Supreme Court specifically noted that judicial factfinding is not inherently less reliable than jury factfinding. See Schriro v. Summerlin , 542 U.S. 348, 355-56, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) ("[F]or every argument why juries are more accurate factfinders, there is another why they are less accurate.... When so many presumably reasonable minds continue to disagree over whether juries are better factfinders at all , we cannot confidently say that judicial factfinding seriously diminishes accuracy."). Of course, we now understand that Florida's prior sentencing scheme is incompatible with the Sixth Amendment, Hurst v. Florida , 136 S.Ct. at 619 ; however, the concerns noted in Caldwell -regarding the Eighth Amendment-have less force under these circumstances, and no constitutional infirmity arises because we cannot conclude that there is a risk of death being imposed arbitrarily or capriciously.
Reynolds directs us to our Eighth Amendment discussion in Hurst . His argument is relatively straightforward- Hurst mandated unanimity in jury sentencing under the Eighth Amendment, which his jury was not instructed on; thus, his jury did not appreciate the significance of its verdict. Yet, this contention misapplies our decision in Hurst . Apprendi , Ring , and Hurst v. Florida were Sixth Amendment *826 cases; and Hurst was largely the same. As Reynolds indicates, one difference between Hurst and those three earlier cases is that we reached an Eighth Amendment issue. 202 So.3d at 59-63.[17] However, we concluded that the Eighth Amendment requires unanimity in jury sentencing. Id. at 59. We did not discuss jury instructions other than to dispel the apprehension that a single holdout juror could derail the administration of a penalty phase. Id. at 62-63. Caldwell claims are related to, but dissimilar from, the Eighth Amendment issue that we discussed in Hurst . As demonstrated above, Caldwell claims, limited to a certain extent by Romano , focus on a jury's understanding of the responsibility ascribed to it by law. That is a wholly different matter from whether the Eighth Amendment requires jury factfinding and final verdicts to be unanimous. It follows that our discussion of the Eighth Amendment in Hurst is inapposite to the matter at hand.
The distinction between Hurst -induced Caldwell claims and the actual rights announced in Hurst is crucial. Reynolds seeks to conflate the two without any recognition of their significant differences. This approach is problematic because it ignores the Sixth and Eighth Amendment rights to a jury trial that we discussed in Hurst . Rather than arguing entitlement to those rights, the claim seeks relief solely because Standard Jury Instruction 7.11 in 2003 was not compliant with Hurst , a case decided thirteen years later. Under such an approach, the holding, timing, and retroactivity of a later case that changes the law are all irrelevant; and the only determinative question is whether the jury instructions given then would be proper today. But that is not Caldwell . This argument stretches Caldwell thin-to a breaking point-well beyond its holding that a sentencer cannot be misled "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 329, 105 S.Ct. 2633. Absent limited, unique circumstances,[18] we have granted resentencing to each post- Ring , nonunanimous defendant who has requested Hurst relief. For those cases that received a unanimous recommendation, we have individually reviewed the circumstances to ensure that any Hurst error did not affect the sentence. E.g. , Davis , 207 So.3d at 173-75. In so doing, our constant focus has been on the Sixth and Eighth Amendment rights to a jury trial elucidated in Hurst ; thus, defendants seeking relief must do so based upon those rights.[19] Moreover, as part of our Hurst harmless error analysis, we already review the jury instructions to determine if the instructions actually given affected the sentence. See Kaczmar , 228 So.3d at 9 ; King , 211 So.3d at 890-91 ; Davis , 207 So.3d at 174-75. Consistent with our precedent, we reviewed Reynolds's jury instructions and concluded that they did not render his Hurst error harmful. Supra , pp. 815-17.
*827 Also, acceptance of Hurst -induced Caldwell claims would produce an absurd result regarding the retroactivity of Hurst because for these claims, unlike other types of Hurst -related claims, Ring is not determinative. See supra pp. 823-24; cf. Asay , 210 So.3d at 15-22. As demonstrated, jury recommendations in Florida under the previous sentencing scheme were advisory both pre- and post- Ring . To invalidate Standard Jury Instruction 7.11, despite the fact that it accurately described the jury's role as advisory, would ignore Romano while allowing Caldwell claims to swallow retroactivity whole. Such a holding, in effect, would make Hurst completely retroactive purely because the pre- Hurst standard jury instruction did not-and could not-reflect Hurst . This outcome would effectively add a fourth prong to the Witt[20] retroactivity test that we employed in Mosley and Asay : whether the jury instructions given accurately predicted the change in law. See Mosley , 209 So.3d at 1276-83 ; Asay , 210 So.3d at 15-22. As already explained, the result advanced by Reynolds becomes particularly circuitous when applied to pre- Ring Caldwell claims. See supra p. 823. Hurst does not apply to pre- Ring cases. E.g. , Hitchcock , 226 So.3d at 217. Thus, the rights announced in Hurst are inapplicable pre- Ring . Id. Regardless, as the argument goes, even pre- Ring juries were being misled as to their responsibility in sentencing notwithstanding the fact that such a responsibility did not exist then and does not exist retroactively. This is the exact unwieldiness of Caldwell that Romano averts. Either juries were being misled or they were not. We conclude that they were not.
Finally, these Hurst -induced Caldwell claims rest upon a simple, albeit conclusory, premise which Reynolds clearly stated: "The chances that at least one juror would not join a death recommendation if a resentencing were now conducted are likely given that proper Caldwell instructions would be required"; thus, the unanimous recommendation does not meet the Eighth Amendment's reliability requirement. To be sure, this notion is unsubstantiated. But it is further weakened by the fact that juror unanimity was not required under Florida's previous death scheme, so a converse argument could be made. Any juror that had any doubt whatsoever could vote for a life sentence without feeling any responsibility for leniency towards the individual found guilty of first-degree murder. Of course, under the previous scheme, the other jurors who voted for death had no incentive to pressure a holdout juror because only a bare majority was required. Before Hurst , jurors had various options for recommendations, including life, 7-to-5 death, 8-to-4 death, 9-to-3 death, 10-to-2 death, 11-to-1 death, and unanimous death outcomes. Now, the sentencing verdict is binary-life or death. Therefore, cases that previously received nonunanimous death recommendations may become unanimous death verdicts. This has already occurred. On March 23, 2017, we granted Hurst relief due to an eight-to-four death jury recommendation , sending Randall Deviney back for resentencing. Deviney v. State , 213 So.3d 794, 794-95 (Fla. 2017). Deviney has already been resentenced to death by a unanimous jury verdict.[21] Plainly, the entire rationale beneath these Hurst -induced Caldwell claims is on uneven footing. We assume that jurors will follow the instructions given to them.
*828 Crain v. State , 894 So.2d 59, 70 (Fla. 2004). Accordingly, we will not guess at whether or not individual jurors before Hurst were voting for the death of another person haphazardly after being instructed by the trial court not to "act hastily or without due regard to the gravity of these proceedings" and to realize "that a human life is at stake." See Fla. Std. Jury Instr. (Crim.) 7.11.
Accordingly, we conclude that Hurst -induced Caldwell claims against the standard jury instruction do not provide an avenue for Hurst relief.
This Case
Based on the foregoing, we conclude that the circuit court properly denied Reynolds's Eighth Amendment Caldwell claim. Reynolds received Standard Jury Instruction 7.11, and his jury was not misled as to its role in sentencing. See Romano , 512 U.S. at 9, 114 S.Ct. 2004. Although not necessary, further supporting our conclusion is the fact that the trial court gave a Tedder instruction, stating that it could reverse the jury recommendation "only if the facts [were] so clear and convincing that virtually no reasonable person could differ." See Tedder , 322 So.2d at 910. In accordance with our general holding pertaining to Hurst -induced Caldwell claims and the actual jury instructions given to Reynolds's jury, we can conclude beyond a reasonable doubt that the jury was properly instructed under the existing law in a manner that underscored "their power to determine the appropriateness of death as an 'awesome responsibility.' " See Caldwell , 472 U.S. at 330, 105 S.Ct. 2633 (quoting Woodson v. North Carolina , 428 U.S. 280, 320, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ).
CONCLUSION
Accordingly, we affirm the circuit court's denial of Reynolds's motion for postconviction relief.
It is so ordered.
LABARGA, C.J., and LEWIS, J., concur.
LAWSON, J., concurs specially with an opinion.
CANADY and POLSTON, JJ., concur in result.
PARIENTE, J., dissents with an opinion.
QUINCE, J., dissents with an opinion.
LAWSON, J., concurring specially.
I concur in the majority's decision. See Okafor v. State , 225 So.3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially). I write briefly, however, to explain why I disagree with the majority's characterization of Hurst v. State , 202 So.3d 40 (Fla. 2016), cert. denied , --- U.S. ----, 137 S.Ct. 2161, 198 L.Ed.2d 246 (2017), as being compelled by or grounded in the Eighth Amendment's prohibition on cruel and unusual punishment and why the majority is wrong to view Reynolds' Eighth Amendment claim pursuant to Caldwell v. Mississippi , 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), through the lens of Hurst .
Florida's Constitution unambiguously mandates that this Court interpret "[t]he prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment ... in conformity with the decisions of the United States Supreme Court," art. I, § 17, Fla. Const., which has held that the Eighth Amendment does not require jury sentencing in capital cases. See Spaziano v. Florida , 468 U.S. 447, 464-65, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), overruled on other grounds by *829 Hurst v. Florida , --- U.S. ----, 136 S.Ct. 616, 624, 193 L.Ed.2d 504 (2016) (overruling Spaziano on Sixth Amendment grounds to the extent it "allow[s] a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty").
In light of Spaziano , a faithful application of the Florida Constitution prohibits grounding Hurst in the Eighth Amendment and, therefore, necessarily prohibits using Hurst to create the Caldwell Eighth Amendment capital sentencing problem that the majority opinion purports to solve. See majority op. at 818-28. Because the "Hurst-induced Caldwell claim" coined by the majority is not cognizable as a matter of law, analyzing a procedurally barred Caldwell claim in light of Hurst is not an exercise that I would-or that this Court should-undertake. See also Owen v. State , 773 So.2d 510, 515 n.11 (Fla. 2000) ("[T]his Court has repeatedly held that Caldwell errors cannot be raised on collateral review.").

Spencer v. State , 615 So.2d 688 (Fla. 1993).

The trial court rejected two statutory mitigators and afforded them no weight: (1) residual doubt; and (2) Reynolds's easy adjustment to prison life.

Any question regarding the continued vitality of Muhammad is not before us today.

Relatedly, Reynolds contends that the Hurst error was harmful because trial counsel would have tried the case differently under the new law. To be sure, attorneys have different considerations to make in the post-Hurst landscape. Reynolds's claim, however, amounts to nothing more than pure speculation. Additionally, as demonstrated above, our harmless error review focuses on the effect on the trier of fact-here the jury-not on potential, after-the-fact trial strategy. For these reasons, this portion of Reynolds's claim fails.

The mercy instruction is the portion of Standard Jury Instruction 7.11 that informs a jury that they are "neither compelled nor required to recommend" death. Perry , 210 So.3d at 640.

Although Justice Pariente is within her prerogative to continue disagreeing on this point of law, it should be noted that the dissenting position has been soundly rejected by this Court. See Grim v. State , No. SC17-1071, 244 So.3d 147 (Fla. Mar. 29, 2018) ; Jones , 212 So.3d at 343 & n.3 ; Kaczmar , 228 So.3d at 9.

Reynolds asserts two other Eighth Amendment arguments. The first, that trial counsel would have tried the case differently under the new law, does not merit discussion, as noted above. See supra note 4. The second, that his indictment failed to list the aggravators, is similarly meritless. We have "repeatedly rejected the argument that aggravating circumstances must be alleged in the indictment." Pham v. State , 70 So.3d 485, 496 (Fla. 2011). Moreover, prior to Hurst , we held that "neither Apprendi nor Ring requires that aggravating circumstances be charged in the indictment." Rogers v. State , 957 So.2d 538, 554 (Fla. 2007). It follows that Hurst did not impact this settled point of law; therefore, this part of Reynolds's Eighth Amendment claim necessarily fails as well.

Other defendants have raised these claims, which we have rejected without discussion. See, e.g. , Truehill v. State , 211 So.3d 930 (Fla.), cert. denied , --- U.S. ----, 138 S.Ct. 3, 199 L.Ed.2d 272 (2017). In light of the dissenting opinions to the denial of certiorari in Truehill v. Florida , however, we now explicitly address what has already been implicitly decided.

The special concurrence takes issue with our viewing this Caldwell claim "through the lens of Hurst ." Concurring specially op. at 828-29 (Lawson, J.). However, we only view Caldwell through the Hurst lens here because that is the claim that Reynolds-along with numerous other defendants-raised. As explained in detail below, we agree with the special concurrence that these types of claims categorically fail and improperly use Caldwell . This Court, however, must acknowledge the challenge in order to answer it definitively.

The excerpted language from section 921.141, Florida Statutes, remained substantively unchanged between Combs and Hurst v. Florida .

Judge Tjoflat's special concurrence was actually the Eleventh Circuit's plurality opinion as it pertained to the Caldwell issue in Harich. Harich , 844 F.2d at 1475 ; see Davis v. Singletary , 119 F.3d 1471, 1482 n.5 (11th Cir. 1997).

In fact, the advisory nature of jury recommendations was the entire point of Hurst v. Florida. 136 S.Ct. at 619 ("We hold this sentencing scheme unconstitutional. The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough.").

Federal courts also agreed with our conclusion in this regard. See, e.g. , Davis v. Sec'y, Dep't of Corrs. , No. 8:08-cv-1842-T-33MAP, 2009 WL 3336043 *1, *32 (M.D. Fla. Oct. 15, 2009) ("Because Florida law remains unchanged after Ring , and because the standard jury instructions accurately describe the jury role at sentencing under Florida law, there can be no Caldwell violation." (citing Romano , 512 U.S. at 9, 114 S.Ct. 2004 ) ); see also Belcher v. Sec'y, Dep't of Corrs. , 427 Fed.Appx. 692, 695 (11th Cir. 2011) ; Troy v. Sec'y, Dep't of Corrs. , No. 8:11-cv-796-T30-AEP, 2013 WL 24212, at *1, *45-47 (M.D. Fla. Jan. 2, 2013) ; Morris v. Sec'y, Dep't of Corrs. , No. 8:06-cv-1289-T-27TGW, 2009 WL 3170497, at *1, *38 (M.D. Fla. Sept. 30, 2009).

The dissent's acknowledgement that this Court consistently rejected Caldwell claims after Ring defeats its own argument that certain justices' recognition of potential problems somehow renders these Hurst -induced Caldwell claims cognizable. See dissenting op. at 831-32 (Pariente, J.). A majority of the Court never recognized these Caldwell issues; therefore, juries were not being misled under Florida law.

Justice Pariente's dissent completely fails to address Romano , which results in a flawed conclusion. According to the dissent, "it is difficult to understand how Florida's standard jury instructions, following an unconstitutional statute, did not also create constitutional error." Dissenting op. at 831. Occasionally the law is difficult to understand when one ignores the controlling precedent. Here, Romano makes it easy to understand that there was no Caldwell violation because the standard jury instruction accurately informed juries of their then-existing responsibilities.

Relatedly, we have expressly rejected Hurst challenges to death sentences imposed solely by trial courts when defendants waived their rights to a penalty phase jury. E.g. , Mullens , 197 So.3d at 38-40.

The special concurrence disputes our "characterization of [Hurst ] as being compelled by or grounded in the Eighth Amendment." Concurring specially op. at 828. Yet Hurst being compelled by or grounded in the Eighth Amendment is not our "characterization" here; it is specifically part of what Hurst held and discussed at length. Hurst , 202 So.3d at 59 ("[T]he foundational precept of the Eighth Amendment calls for unanimity in any death recommendation that results in a sentence of death.").

See State v. Silvia , 235 So.3d 349 (Fla. 2018).

Our discussion in this case is limited to Hurst -induced Caldwell claims against Standard Jury Instruction 7.11. Obviously, this opinion does not affect proper Caldwell challenges.

Witt v. State , 387 So.2d 922 (Fla. 1980).

Man Gets Death Sentence Again for Killing Neighbor , Chi. Trib., Oct. 14, 2017, http://www.chicagotribune.com/news/sns-bc-fl--death-penalty-hearing20171014-story.html.