# Supreme Court of Florida

_____

No. SC2022-0378
_____

**MARKEITH D. LOYD,**
Appellant/Cross-Appellee,

vs.

**STATE OF FLORIDA,**
Appellee/Cross-Appellant.

November 16, 2023

PER CURIAM.

Markeith Demangzlo Loyd was charged with and convicted of first-degree murder, attempted first-degree murder, aggravated assault with a deadly weapon, carjacking with a firearm, and possession of a firearm by a convicted felon. He appeals these convictions and his death sentence for the first-degree murder.[1] We affirm all convictions and his death sentence.

_____

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

## FACTS AND PROCEDURAL BACKGROUND

### Guilt Phase

Early on January 9, 2017, Loyd—on the run for the murders of his girlfriend, Sade Dixon, and their unborn baby[2]—entered a Walmart where a witness familiar with Loyd and his previously committed murders spotted Loyd in the checkout line wearing a bulletproof vest. This witness immediately exited the store and alerted a uniformed police officer that Loyd was inside. The officer was Lieutenant Debra Clayton. Soon after, Lieutenant Clayton confronted Loyd as he exited the store into the parking lot. Lieutenant Clayton commanded that he "get on the ground." Loyd responded by rushing behind a pillar and then hastily reemerged with his gun drawn. Loyd fired at Lieutenant Clayton, and she returned fire. Lieutenant Clayton was shot and fell to the ground. Loyd then moved towards Lieutenant Clayton until he stood over her and delivered a fatal shot into her neck.

Loyd then fled the Walmart parking lot in his vehicle. After dispatch radioed the news of Lieutenant Clayton's shooting,

---

2. In 2019, before the trial in this case, Loyd was convicted of these murders and sentenced to life.

Captain Joseph Carter pursued Loyd into the parking lot of an apartment complex. As Captain Carter emerged from his vehicle, Loyd shot at him twice, but hit only his hubcap. Captain Carter then maneuvered his vehicle to block in Loyd's vehicle, and Loyd took off running. Loyd then approached a resident of the apartment complex, Antwyne Thomas, and pointed his gun at Thomas's face. Loyd demanded that Thomas hand over his car keys. Frightened, Thomas threw his keys into the air and ran into his apartment.

Loyd evaded arrest until law enforcement officers found him inside a house on January 17, 2017. At the scene of the arrest, law enforcement recovered a bulletproof vest, the gun used to murder Sade Dixon, her unborn child, and Lieutenant Clayton, and the gun used in the attempted murder of Captain Carter.

At trial, the State proved its case largely through eyewitness testimony. In his defense, Loyd offered alternative theories of self-defense and insanity. Loyd testified about his upbringing and history of mental health issues. He then presented his version of the Walmart shooting and confrontation with Captain Carter. Finally, a clinical and forensic psychologist testified that

Loyd met the legal definition of insanity at the time of the charged offenses.

On rebuttal, the State offered Loyd's Facebook posts that stressed Loyd's critical and hateful views on race and the police. The Facebook posts revealed that Loyd believes there is tension between the police and members of his race, and that physical violence against the police is justified. The State then called two experts to rebut Loyd's assertion that he was insane at the time of the charged offenses.

The jury found Loyd guilty as charged as to each of the five counts of the indictment.

**Penalty Phase**

During the penalty phase, the State relied on evidence from the guilt phase and presented new evidence about Loyd's history of criminal convictions. The State also presented victim impact evidence through four witnesses and a slide presentation with photographs of Lieutenant Clayton.

After the State rested, the defense called Loyd's friends and family members to discuss Loyd's generosity and devotion to family. Then the defense presented evidence of injuries Loyd sustained

during his arrest. Finally, the defense called four experts to opine on Loyd's mental condition. The State, on rebuttal, called a neuroradiologist who questioned the observations of one of Loyd's experts.

The jury heard closing arguments and, after deliberation, returned with a unanimous recommendation for death. The jury found beyond a reasonable doubt the existence of all the proposed aggravating factors.

### *Spencer*[3] **Hearing & Sentencing**

After holding a *Spencer* hearing and considering all of the testimony and evidence, the trial court sentenced Loyd to death,[4] finding three aggravators: (1) the defendant was previously convicted of a felony and on felony probation when the first-degree murder was committed (slight weight); (2) the defendant was previously convicted of another capital felony or of a felony involving

---

3. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

4. The court also sentenced Loyd to life in prison for attempted first-degree murder; five years in prison for aggravated assault with a deadly weapon; life in prison for carjacking with a firearm; and fifteen years in prison for possession of a firearm by a convicted felon.

the use or threat of violence to the person (great weight); and (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest/the capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or enforcement of laws/the victim of the capital felony was a law enforcement officer engaged in the performance of her official duties (merged) (great weight).  Regarding the statutory age mitigator, the court found that the defendant did prove the defendant's age at the time of the crime (forty-one years old) but gave the mitigator no weight.  The court found five nonstatutory mitigators: the defendant's psychological and psychiatric mitigators (moderate weight); the defendant's childhood trauma (moderate weight); the defendant's trauma as an adult (some weight); the trauma of racism (minimal weight); and circumstances related to defendant's offer to surrender and his arrest (minimal weight).

This appeal followed.

## ANALYSIS

Loyd raises thirteen challenges to his convictions and death sentence.  No challenge warrants reversal.  The State raises one

challenge on cross-appeal, which is moot based on this decision. We will address the claims in the order presented.

## Loyd's Challenges

*Issue I: Venire Members Removed for Cause.* Before voir dire, the court, in response to a motion in limine filed by the State, excluded during the guilt phase and limited during the penalty phase any evidence of law enforcement's use of force during Loyd's arrest. Then, during voir dire, the trial judge granted three of the State's cause challenges to prospective jurors who were "in possession of information that ha[d] been ruled inadmissible," referring to the evidence of the use of force. The court mentioned that it was aware of a "long line of cases" establishing that it is reversible error to deny cause challenges to prospective jurors who know of facts that the court excluded.

Loyd argues that this was error, relying on *Ault v. State*, 866 So. 2d 674 (Fla. 2003), and *Gray v. Mississippi*, 481 U.S. 648 (1987). According to Loyd, these cases hold that there is no basis to strike a prospective juror for cause if the prospective juror affirms that he or she could set aside any bias and render a verdict impartially. Because two of the excluded venire members affirmed

- 7 -

that they could do so here and Loyd was precluded from asking the third whether he could do so, Loyd believes that the trial court manifestly erred by striking them for cause. The State responds that *Ault* and *Gray* are not on point and that the trial court properly excluded the prospective jurors. We agree with the State; the trial court did not err by excluding these potential jurors.

We defer to a trial judge's decision to exclude a prospective juror. *Johnson v. State*, 969 So. 2d 938, 946 (Fla. 2007). Indeed, we will overturn a trial court's ruling on a cause challenge only for manifest error, which is tantamount to an abuse of discretion. *Id.* An abuse of discretion occurs when the judge adopts a view that no other reasonable person would take. *Singleton v. State*, 783 So. 2d 970, 973 (Fla. 2001).

A reasonable judge should excuse a prospective juror for cause "if any reasonable doubt exists as to whether the [prospective] juror possesses an impartial state of mind." *Ault*, 866 So. 2d at 683. "[E]xposure to inadmissible and prejudicial information through pretrial publicity is a classic example of a valid ground for a cause challenge." *Hamdeh v. State,* 762 So. 2d 1030, 1032 (Fla. 3d DCA 2000). The trial court's decision to exclude the three prospective

jurors here fits within this standard. Thus, we conclude that the trial court did not abuse its discretion.

Loyd's reliance on *Ault* and *Gray* is misplaced. These cases address the rules for excluding a juror who has a preformed belief about the death penalty. In *Gray*, the trial court removed a potential juror for cause despite her statement that she could ultimately impose the death sentence. 481 U.S. at 654. The Supreme Court held that the trial judge erred, and this error is not subject to a harmless error analysis. *Id.* at 659, 668. *Ault* addressed the same issue and relied on *Gray* to conclude that "it is reversible error to exclude for cause a juror who can follow the instructions and oath in regard to the death penalty." *Ault*, 866 So. 2d at 686. The situation in *Gray* and *Ault* is not present here—the trial court did not excuse the jurors for their views on the death penalty. Instead, the trial court excused the jurors for their knowledge of inadmissible information.

For these reasons, we deny this claim.

*Issue II: Jury Instruction on Insanity.* Standard Criminal Jury Instruction 3.6(a) states: "[c]lear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such

weight that it produces a firm belief, without hesitation, about the matter in issue." This instruction, Loyd argues, confuses the clear and convincing standard with the beyond a reasonable doubt standard. Loyd believes that because the trial court did not modify the standard instruction to alleviate this confusion, we should remand for a new trial. We disagree.

We addressed the same argument in *Standard Jury Instructions-Criminal Cases (99-2)*, 777 So. 2d 366, 368 (Fla. 2000), in which we approved Standard Jury Instruction 2.03, which is used in Jimmy Ryce civil commitment proceedings and provides the same definition of clear and convincing evidence as Standard Criminal Jury Instruction 3.6(a). In that case, we expressly considered concerns that the proposed definition of clear and convincing evidence overstated "the applicable burden of proof to a level equal to, or even higher than, the 'beyond a reasonable doubt' standard." *Id.* at 368. In rejecting that argument, we concluded that the "proposed definition of 'clear and convincing evidence' is consistent with established caselaw definitions of that term." *Id.* (citing *In re Davey*, 645 So. 2d 398, 404 (Fla. 1994); *Slomowitz v. Walker*, 429 So. 2d 797, 800 (Fla. 4th DCA 1983)).

Loyd's challenge offers no compelling reason why *Criminal Cases (99-2)* is incorrect. Thus, we deny this claim.

*Issue III: The State's Remarks About Premeditation During Its Guilt Phase Closing.* Because Loyd did not contemporaneously object to the challenged remarks, we review this argument for fundamental error. *Kaczmar v. State*, 228 So. 3d 1, 11 (Fla. 2017). Fundamental error reaches "down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *State v. Delva*, 575 So. 2d 643, 644-45 (Fla. 1991).

Loyd argues that the State misstated the law defining premeditation when it discussed with the jury the instructions regarding the attempted first-degree murder of Captain Carter. Specifically, Loyd complains that the State told the jury that "premeditated design" means a conscious intent to kill that "has to be present in the person's mind during the act" and that deciding to smack a mosquito on one's arm rather than brushing it off "is an intent to kill that was formed in your mind at the time and during the actual act." Loyd asserts that these unobjected-to statements rise to the level of fundamental error because while the

second sentence of Standard Jury Instruction 7.2 states that the decision to kill "must be present in the mind at the time of the killing," the first sentence of that instruction states that killing with premeditation means "killing after consciously deciding to do so."

At the time the State made the alleged erroneous statements, it was not discussing Standard Jury Instruction 7.2, titled, Murder – First Degree, but Standard Jury Instruction 6.2, titled, Attempted Murder – First Degree (Premeditated). The instructions read and provided to the jury regarding the attempted first-degree murder of Captain Carter were displayed on a screen visible to the jury at the time the State made the alleged erroneous statements. Those instructions were directly quoted from Standard Jury Instruction 6.2 and stated:

> A premeditated design to kill means that there was a conscious decision to kill. The decision must be present in the mind at the time the act was committed. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the act. The period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the act was committed.

Thus, while Loyd is correct that the premeditated intent to kill must be formed before the act was committed, the State was also

correct in telling the jury that a conscious intent to kill has to be present in the person's mind during the act in order to convict for attempted first-degree murder. The State's argument did not misstate the law and was not misleading when taken in context. The instruction stating that the premeditated intent to kill must be formed before the act was committed was displayed on screen at the time the State was discussing the instruction with the jury, and the trial court read that very instruction to the jury four times before the State's argument. And after the arguments, the court again instructed the jury to follow only the law spelled out in the jury instructions and that no other laws apply to this case. The court also distributed physical copies of the complete instructions to the jury.

Even if we were to conclude that the State's argument was misleading for failing to also tell the jury that the premeditated intent to kill must be formed before the act was committed, we certainly would not find that the alleged error rises to the level of fundamental error such that a verdict of guilty could not have been obtained without the assistance of the alleged error in light of the facts that the "before the act was committed" portion of the

instructions was simultaneously displayed to the jury during the alleged misleading statements and read to the jury four times by the trial court. Thus, Loyd is not entitled to relief on this claim.

*Issue IV: Alleged Improper Argument During the State's Penalty Phase Closing.* Loyd objects to three distinct comments that the State made during its penalty phase closing argument. We review "trial court rulings regarding the propriety of comments made during closing argument for an abuse of discretion." *Cardona v. State,* 185 So. 3d 514, 520 (Fla. 2016). If the comments were improper, and the court overruled the objections to them, we apply the harmless error standard of review. *Id.* We address each comment in turn.

## A. The "obligation" remark

Loyd asserts that the State improperly remarked in its penalty phase closing that the jurors "ha[d] an obligation to . . . try [their] best to reach a unanimous verdict." But Loyd misstates the record. What the State actually said is: "I would suggest to you that as the instructions point out, you have an obligation to give meaningful consideration to everything. And not only that, but that you try your best to reach a unanimous verdict." Loyd argues that the trial

court erred in overruling his objection to this remark based on "misstatement of the law." Contrary to what Loyd first asserts, the State did not command the jurors that they had to reach a unanimous verdict. Although Loyd acknowledged his misstatement of the record in his reply brief, he still argues that it is "just as objectionable" that the State instructed the jurors to try their best to reach a unanimous verdict because it minimized their individualized roles. We disagree.

There was nothing improper about the State's remark. It did not misstate the law. Indeed, the trial court, in accordance with Standard Criminal Jury Instruction 3.10, instructed the jury, "Whatever verdict you render must be unanimous, that is, each juror must agree to the same verdict." Nor did the State minimize the jurors' individualized roles, especially when the remark is considered in the context of the State's entire closing argument, in which the State also made the following remarks:

> And while it is true, as you have been told several times, that your decision as to whether or not a sentence of death is appropriate is an individualized decision, that is nothing new to you. That is something you have already done, because what the instructions and the law tell you is that each of you reach an individualized decision, and

only if you're unanimous that death is the appropriate punishment can it be imposed.

. . .

So you're going to be – it's going to be emphasized to you and I will emphasize to you that you're making an individualized decision.

. . .

This is an important decision and all I am suggesting is that you-all collaborate together understanding you will make an individualized decision to reach a decision that is commiserate [sic] with the task in front of you.

In those comments, the State emphasized rather than minimized the jurors' individualized roles. The trial court did not abuse its discretion in allowing the statement.

B. <u>The remark about mitigating circumstances</u>

Loyd next argues that the State told the jury that it had no need to consider the proffered mitigating circumstance of whether Loyd's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. But again, Loyd misstates the record. The State argued that when considering this mitigating circumstance, the jurors should consider, among other evidence, that they already determined that Loyd knew the difference between right and wrong when they rejected the insanity defense. "The finding of sanity . . .

- 16 -

does not eliminate consideration of the statutory mitigating factors concerning mental condition." *Mines v. State*, 390 So. 2d 332, 337 (Fla. 1980). But "no rule of law states that the [factfinder] must ignore the findings [of sanity] in weighing the mitigating factors." *Globe v. State*, 877 So. 2d 663, 676 (Fla. 2004). Thus, the State's remark was proper, and the trial court did not abuse its discretion.

## C. The "piece of paper" remark

Loyd claims that the trial court erred in denying his motion for mistrial over the following remarks from the prosecutor:

> STATE: On the screen in front of you are the judgment and sentence for the Dixon murder. And they tell you what you already know, which is that Mr. Loyd got life sentences not just for the murders of Sade Dixon and her unborn child.
> DEFENSE COUNSEL: Objection, Judge.
> THE COURT: Overruled.
> DEFENSE COUNSEL: Argument.
> [STATE]: He was given life for the attempted murder of Ronald Stewart, the attempted murder of Stephanie Dixon Daniels, and the attempted murder of Dominique Daniels. Is another sentence of life appropriate in this case?
> DEFENSE COUNSEL: Objection. Improper argument.
> THE COURT: Overruled.
> STATE: The reality is, it would be another piece of paper in Mr. Loyd's file.
> DEFENSE COUNSEL: Objection. Improper argument.
> THE COURT: Sustained. Rephrase.

Following the sustained objection, Loyd preserved the issue for appeal when he moved for a mistrial, arguing that the State instructed the jury to rely on nonstatutory aggravation. The trial court denied the motion.

We review "a trial court's ruling on a motion for mistrial under an abuse of discretion standard." *Salazar v. State*, 991 So. 2d 364, 371 (Fla. 2008). A trial court should grant a mistrial only when the error is so prejudicial that it vitiates the whole trial. *Id.* at 372. This occurs when a prosecutor's comments "deprive the defendant of a fair and impartial trial, materially contribute to the [verdict], [are] so harmful or fundamentally tainted as to require a new trial, or [are] so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." *Spencer v. State*, 645 So. 2d 377, 383 (Fla. 1994). Under this exacting standard, we find that the trial court did not abuse its discretion in denying the motion for mistrial.

First, this was one comment in an otherwise long closing argument. The judge properly instructed the jury on the correct law and to follow only the law in the jury instructions. Additionally, the previous judgments and sentences that the State referenced

were in evidence for the jury to consider. Indeed, Loyd addressed

the evidence and directly rebutted the State's closing remark:

> For you to say, Oh, oh, well, you know, just it's a piece of paper, if we don't give him anything but death, like [the State] suggested, is a serious problem with justice. . . . [Y]ou cannot decide that because he got [life] once before I'm going to give it to him again.

Overall, the court thoroughly considered the motion and did not

believe that this remark rose to the level required to grant a

mistrial. The trial court heard the remark and was best able to

gauge its consequences. *See Murphy v. Int'l Robotic Sys., Inc.*, 766

So. 2d 1010, 1023 (Fla. 2000).

In the end, none of the three remarks that Loyd challenges

warrant reversal. We deny relief on this claim.

*Issue V: The Burden to Prove Mitigating Circumstances.*

Standard Criminal Jury Instruction 7.11 states, "It is the

defendant's burden to prove that one or more mitigating

circumstances exist. . . . [T]he defendant need only establish a

mitigating circumstance by the greater weight of the evidence."

Loyd asked the trial court to omit this language because "[t]here is

nothing in [Florida's death penalty] statute that imposes a

burden . . . on [the defendant] to prove mitigating circumstances by any burden of proof." Now, to this Court, Loyd argues that the trial court erred in overruling the objection to the jury instruction on grounds well beyond those made to the trial court. Any argument besides the specific one made to the trial court was not preserved for our review. *Reynolds v. State*, 934 So. 2d 1128, 1150-51 (Fla. 2006) ("To challenge jury instructions, a party must object to the form of those instructions and specifically state the grounds upon which the objection is based." (citing Fla. R. Crim. P. 3.390(d))). Thus, we address only whether the trial court erred in reading the standard jury instruction because in Loyd's view it does not comport with section 921.141(2)(b), Florida Statutes (2021).

To recommend a death sentence, the jury must first weigh "[w]hether aggravating factors exist which outweigh the mitigating circumstances found to exist." § 921.141(2)(b)2.b. Our case law has expounded on how a mitigating circumstance is "found to exist." We have stated that "a mitigating circumstance exists where it is established by the greater weight of the evidence." *Bright v. State*, 299 So. 3d 985, 1000 (Fla. 2020). This is not a novel principle, though; our case law has long recognized that a

mitigating circumstance is established by the greater weight of the evidence. *E.g., Diaz v. State*, 132 So. 3d 93, 117 (Fla. 2013) (noting that it is established law that mitigating factors be proven by a greater weight of the evidence); *Coday v. State*, 946 So. 2d 988, 1000-01 (Fla. 2006) (discussing the evolution of this "basic principle"). In 2009, explicitly based on the case law, we incorporated this burden of proof for mitigating circumstances into the standard jury instructions. *In re Standard Jury Instructions in Crim. Cases-Rpt. No. 2005-2*, 22 So. 3d 17, 21 (Fla. 2009). The jury instruction language has slightly changed since 2009, but its foundation—that mitigating circumstances exist when established by the greater weight of the evidence—firmly remains. Thus, Loyd's argument is meritless, and we deny this claim.

*Issue VI: Victim Impact Evidence.* During the penalty phase, the State presented victim impact evidence. One piece of evidence that the State displayed was a slide presentation consisting of nineteen photographs of Lieutenant Clayton and one video clip of her speaking to the community. The presentation was set to instrumental music. The trial court overruled a defense objection

to the music. We find that the trial court abused its discretion in allowing the music to play but that the error was harmless.

Victim impact evidence is allowed once the prosecution has offered evidence "of the existence of one or more aggravating factors as described in subsection (6)." § 921.141(8), Fla. Stat. Victim impact evidence must show "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." *Id.* In other words, victim impact evidence must have some connection to the victim. Yet, as the State admitted at oral argument, the music here had no association with Lieutenant Clayton's uniqueness as a human—it was simply background music. Thus, allowing the irrelevant instrumental music to play was error.

This error does not automatically justify reversal. Improperly admitted evidence is subject to the harmless error analysis. *Davis v. State*, 347 So. 3d 315, 324 (Fla. 2022). Loyd "acknowledges that the montage was not maudlin[ ] and was not exploited by the State in argument."

Plus, the court read the jury instruction on victim impact evidence three times throughout the penalty phase, which advised

the jury that it could not consider victim impact evidence as an aggravating factor.  As a result, we conclude that allowing the music was harmless and deny relief on this claim.

Also, the jurors were provided physical copies of the instructions.  Finally, both the defense in its opening and the State in its charge to the jury repeated what the jurors already knew from the instructions.  As a result, we conclude that allowing the music was harmless error, and we deny relief on this claim.

*Issue VII:  Loyd's Competency to Be Sentenced.*  Prior to sentencing the trial court conducted a competency hearing.  The trial court determined that Loyd was competent to proceed.  Now, Loyd argues that the trial court abused its discretion in reaching its conclusion.  At the outset, we note that much of Loyd's argument asks this Court to reweigh the evidence, which we will not do.  *See Mason v. State*, 597 So. 2d 776, 779 (Fla. 1992) ("It is the duty of the trial court to determine what weight should be given to conflicting testimony.").  For the reasons below, we find that the trial court did not abuse its discretion.

"A trial court's decision regarding a determination of competency is subject to review for abuse of discretion, and the trial

court's resolution of factual disputes will be upheld if supported by competent, substantial evidence." *Larkin v. State*, 147 So. 3d 452, 464 (Fla. 2014). "The test for whether a defendant is competent to stand trial is 'whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " *Peede v. State*, 955 So. 2d 480, 488 (Fla. 2007) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

The trial court thoroughly explained the evidence it relied on to make its determination of competency. The trial court found that Dr. Danziger and Dr. Oses "both opined that the Defendant has a factual understanding of the proceedings against him, the charges against him, [and] the range and nature of the penalties, including the fact he might be sentenced to death." Dr. Danziger testified that "there is no issue with [Loyd's] intellectual ability and no issue with his factual understanding." Dr. Oses testified that Loyd's appreciation of the charges and allegations "was acceptable. [Loyd] understood that he was now looking at, you know, the sentencing

phase and that was in conjunction with him understanding that his attorneys were present and the seriousness of the case."

Next, when analyzing whether Loyd had a rational understanding of the proceedings, the trial court acknowledged that the experts presented conflicting testimony. So, the court turned to its own observations. The trial court noted that it had extensive interactions with Loyd over the course of his proceedings. But the court then turned its attention to the current trial because the competency test requires sufficient present ability. The court observed that Loyd "actively participated in his defense throughout the trial. He would object to lawyers ending their examination of a witness and confer with them as to further questions. . . . He constantly communicated with his attorneys at counsel table." Not once during the trial did the lawyers question his competence. The court also observed that Loyd spent hours on the stand testifying and answering questions about the case with ease. The court paid particular attention to the many times during his testimony when Loyd would pause to ask the court whether he could speak about certain issues that he thought were inadmissible based on previous rulings.

The rest of the trial court's order addressed certain observations "so that the record is clear." For example, the trial court found that it was always able to redirect Loyd to the relevant discussion if he ever strayed from such. And the trial court's observations of Loyd's behavior over three years, which never significantly changed, supported Dr. Oses's observations. Overall, the trial court's order made it clear that competent, substantial evidence supports its conclusion. Thus, we deny relief on this claim.

*Issue VIII:  Equal Protection Challenge to Statute Excluding Felons from the Jury.* Before trial, Loyd challenged the entire jury panel on the basis that the statute that excludes felons from serving on a jury, section 40.013, Florida Statutes (2021), violates the Equal Protection Clause of the United States Constitution. The trial court denied this challenge. Loyd now argues that the trial court erred in denying this claim and that we should remand the matter for "further hearing." Loyd offers no authority to support remanding a case for "further hearing" on a pretrial motion without disturbing the convictions and sentences. Even if we could provide such relief, Loyd's argument fails on the merits.

To assess whether a facially neutral statute that allegedly has a disparate impact violates the Equal Protection Clause of the Fourteenth Amendment, courts apply "the rational relationship test unless some evidence of purposeful intent to discriminate has been shown." *United States v. Greene*, 995 F.2d 793, 796 (8th Cir. 1993). To show purposeful intent, Loyd cites two law review articles for the proposition that "Florida's juror disqualification law was enacted as part of an effort to keep Blacks oppressed in the wake of emancipation." In other words, Loyd argues that discriminatory intent underlies the statute because two authors said so. This is not evidence—this is instead a restatement of the conclusion that Loyd is attempting to prove. Repetition cannot substitute for evidence. Thus, Loyd has not met his burden, and the rational basis test applies.

As many courts across the country have found, laws of this sort pass a rational basis test. *See United States v. Barry*, 71 F.3d 1269, 1273 (7th Cir. 1995); *Greene*, 995 F.2d at 795-96 (citing a line of cases holding "that the exclusion from juror eligibility of persons charged with a felony is rationally related to the legitimate

- 27 -

governmental purpose of guaranteeing the probity of jurors"). We agree and deny this claim.

*Issue IX: An Express Jury Instruction on Mercy.* Loyd requested a special jury instruction and proposed two alternative instructions, each of which expressly told the jury that it could consider mercy in making its sentencing determination. The trial court denied the request and instead used Standard Criminal Jury Instruction 7.11, which stated, in relevant part: "Regardless of the results of each juror's individual weighing process . . . the law neither compels nor requires you to determine that the defendant should be sentenced to death." Loyd asserts that the trial court's denial of a special instruction amounts to structural error, yet Loyd acknowledges that there is contrary precedent from this Court on this issue, namely *Woodbury v. State,* 320 So. 3d 631 (Fla. 2021), *cert. denied,* 142 S. Ct. 1135 (2022). *See also Bush v. State,* 295 So. 3d 179, 210 (Fla. 2020) ("Bush's argument that he was entitled to a jury instruction on mercy is also without merit."); *Downs v. Moore,* 801 So. 2d 906, 913 (Fla. 2001); *Booker v. State,* 773 So. 2d 1079, 1091 (Fla. 2000); *Elledge v. State,* 706 So. 2d 1340, 1346 (Fla.

1997).  And Loyd provides no compelling reason why we should overturn our precedent.

In *Woodbury*, the defendant requested similar special jury instructions on mercy.  320 So. 3d at 655-56.  The trial court denied the request and read Standard Instruction 7.11 instead.  *Id.* This Court affirmed the trial court's ruling "because the instruction that was read to the jury adequately informed the jurors of the applicable legal standard."  *Id.* at 656.  This Court has even referred to the relevant provision of Standard Instruction 7.11 as the "mercy instruction."  *Id.* (quoting *Reynolds v. State*, 251 So. 3d 811, 816 n.5 (Fla. 2018)).  "Thus, the court *did* read an instruction on mercy, and although Woodbury might have preferred the wording of his proposed instruction, Standard Jury Instruction 7.11 is not ambiguous when it comes to addressing the jurors' options."  *Id.*

"[T]he failure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards."  *Stephens v. State*, 787 So. 2d 747, 755 (Fla. 2001).  Loyd did not show that "the standard instruction[s] did not adequately cover the theory [of mercy]."  *Id.* at 756.

For these reasons, we deny relief on this claim.

*Issue X: Death Qualification of Jury.* Loyd argues that death qualifying the jury skews it towards guilt and violates the Sixth Amendment to the United States Constitution. Loyd concedes that this Court has rejected this claim before, yet raises it to preserve it for federal review. We have indeed repeatedly rejected this claim. *See Wade v. State*, 41 So. 3d 857, 873 (Fla. 2010); *Chamberlain v. State*, 881 So. 2d 1087, 1096 (Fla. 2004); *San Martin v. State*, 717 So. 2d 462, 467 (Fla. 1998); *San Martin v. State*, 705 So. 2d 1337, 1343 (Fla. 1997). So too has the United States Supreme Court. *See Lockhart v. McCree*, 476 U.S. 162, 173 (1986) ("[T]he Constitution does not prohibit the States from 'death qualifying' juries in capital cases."). We again deny this claim.

*Issue XI: The Death Penalty's Constitutionality.* Loyd asks this Court to find that the death penalty violates the Eighth Amendment to the United States Constitution. Loyd argues that four factors contribute to this violation: (1) the death penalty no longer matches society's standards of decency; (2) thirty people sentenced to death have been exonerated in Florida; (3) jurors from certain geographical areas are more inclined to recommend a death

sentence; and (4) there are long delays between the imposition of the sentence and the execution of the sentence. The last three factors come from Justice Breyer's dissent in *Glossip v. Gross*, 576 U.S. 863 (2015). We find none of them convincing.

To begin, we have recently rejected argument (4). In *Dillbeck v. State*, 357 So. 3d 94, 103 (Fla.), *cert. denied*, 143 S. Ct. 856 (2023), we emphasized our longstanding precedent that these claims "are 'facially invalid,' including when the defendant's stay on death row exceeded 30 years." Loyd has not persuaded us here to change our position on this argument.

We also can quickly dispose of argument (2). The State correctly notes that exonerations undermine not the sentence but the conviction. Responding directly to Justice Breyer's dissent in *Glossip*, Justice Scalia characterized this argument as internally contradictory and "gobbledy-gook." *Glossip*, 576 U.S. at 895 (Scalia, J., concurring). We too find it hard to understand how alleged issues in the guilt phase render a certain punishment unconstitutional. The same logic would make life imprisonment unconstitutional if enough people serving life are exonerated. This argument has no merit.

Turning to argument (3), we are persuaded by Justice Thomas's *Glossip* concurrence, which adequately explains why this argument is meritless. Justice Thomas stated that relying on the studies that conclude that locality plays too heavily a role in death sentencing "to determine the constitutionality of the death penalty fails to respect the values implicit in the Constitution's allocation of decisionmaking in this context." *Id.* at 901 (Thomas, J. concurring). Indeed, the two provisions in the Constitution memorializing that crimes are tried by a local jury "ensure that capital defendants are given the option to be sentenced by a jury of their peers who, collectively, are better situated to make the moral judgment between life and death than are the products of [these studies]." *Id.* at 902-03. Additionally, "the results of these studies are inherently unreliable because they purport to control for egregiousness by quantifying moral depravity in a process that is itself arbitrary" and dehumanizing. *Id.* at 903. For these reasons, Loyd's argument (3) is unconvincing.

Finally, Loyd's argument (1), that the death sentence is now inconsistent with our society's standard of decency, is similarly unavailing. Again, Loyd relies on Justice Breyer's dissent in

*Glossip.* The Court's opinion in *Glossip*, however, upheld the constitutionality of the death penalty. 576 U.S. at 867 (majority opinion); *see also id.* at 869 (recognizing that it is settled law that capital punishment is constitutional). Loyd argues that because other states have outlawed capital punishment, it is now unconstitutional. We addressed a similar argument in *Long v. State*, 271 So. 3d 938 (Fla. 2019). Responding to an argument that Florida's three-drug method of execution was unconstitutional because other states have adopted a one-drug protocol, this Court concluded that "Florida's current protocol does not violate the constitution simply because other states have altered their methods of lethal injection." *Id.* at 945 (quoting *Muhammad v. State*, 132 So. 3d 176, 196-97 (Fla. 2013)). In a similar vein, the death sentence is not unconstitutional just because other states have chosen to abolish it. At bottom, the Constitution itself contemplates, in the Fifth and Fourteenth Amendments, that the government may take a life if the government affords the person due process of law. Loyd falls well short of the hurdle it takes to prove that something the Constitution permits is at the same time unconstitutional.

- 33 -

Because none of Loyd's arguments are convincing, we deny this claim.

*Issue XII: Extending* Atkins v. Virginia*, 536 U.S. 304 (2002).* Loyd asks this Court to extend *Atkins*—which precludes the execution of the intellectually disabled—to prohibit the execution of the severely mentally ill. To start, there is no evidence that Loyd is severely mentally ill. There is evidence to the contrary, however. Regardless, we refused this same request recently in *Wells v. State*, 364 So. 3d 1005, 1016 (Fla. 2023). *Wells* joined a long line of Florida cases and other jurisdictions refusing to extend *Atkins*. *See id.* (citing cases). We adhere to our precedent and deny this claim.

*Issue XIII: The Constitutionality of Florida's Death Penalty Scheme.* Loyd argues that Florida's death penalty scheme is arbitrary and thus violates the Fourteenth Amendment to the United States Constitution under *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), and *Pulley v. Harris*, 465 U.S. 37 (1984). According to Loyd, the scheme is arbitrary for two reasons: (1) Florida eliminated both the safeguards of comparative proportionality review and the special standard of review that was previously applied in wholly

circumstantial evidence cases[5] and (2) Florida's scheme fails to narrow the class of first-degree murderers eligible for the death penalty.

Recently, in *Wells*, 364 So. 3d at 1015, this Court addressed whether the lack of proportionality review and the "sheer number of aggravating factors in the statute" amounted to an Eighth Amendment violation. We first recognized that we have "repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty." *Id.* Eliminating proportionality review did not change that analysis. *Id.* Proportionality review is not integral to the Eighth Amendment. *Id.*

---

5. In his initial brief, Loyd refers to this as "the 'reasonable hypothesis of innocence' motion for judgment of acquittal," but his citation to *Bush*, 295 So. 3d 179, makes clear that he is indeed referencing the elimination of the special standard of review that was previously applied in wholly circumstantial evidence cases, i.e., "Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence," *id.* at 200 (quoting *Knight v. State*, 107 So. 3d 449, 457 (Fla. 5th DCA 2013)).

Loyd adds another alleged infirmity to the argument: the elimination of the special standard of review previously used in cases involving wholly circumstantial evidence. We note that Loyd does not at all explain how eliminating this leads to an arbitrary scheme. Loyd's argument is simply that because the special standard of review was a safeguard, eliminating it contributes to a constitutional violation. His failure to elaborate leaves us little to respond to. That said, this Court eliminated this special jury instruction reflecting this special standard in 1981, *Bush*, 295 So. 3d at 200, and stopped using it as an appellate standard of review in 2020, *id.* at 199. We concluded that it is confusing and incorrect as both a jury instruction and appellate standard of review. *Id.* at 200. Loyd does not show how the elimination of a confusing and incorrect jury instruction or standard of review creates a constitutional problem. Thus, we deny relief on this claim.

## The State's Cross-Appeal

*The State's Proposed Modification to Standard Criminal Jury Instructions 7.10 and 7.11 and Verdict Form 3.12(e).* The State argues that *State v. Poole*, 297 So. 3d 487 (Fla. 2020), eliminated any requirement of "weighing" or "sufficiency" that *Hurst v. State*,

- 36 -

202 So. 3d 40 (Fla. 2016), originally declared and that was reflected in Standard Criminal Jury Instructions 7.10 and 7.11 and Verdict Form 3.12(e) at the time of Loyd's trial. Because we affirm Loyd's convictions and death sentence, we decline to address the merits of this cross-appeal. *See Davis v. State*, 207 So. 3d 142, 158 (Fla. 2016) ("[G]iven our resolution of this direct appeal, we decline to reach the State's cross-appeal.").

## Sufficiency of the Evidence

On direct appeal of a death sentence, this Court independently reviews the record to determine whether the jury's verdict on the homicide charge is supported by competent, substantial evidence. Fla. R. App. P. 9.142(a)(5); *Gordon v. State*, 350 So. 3d 25, 38 (Fla. 2022), *cert. denied*, 143 S. Ct. 1092 (2023).

Three eyewitnesses testified at trial about the Walmart shooting. One witness saw Loyd shoot Lieutenant Clayton as he stood over her body on the ground. And another eyewitness testified that Loyd fired the first shot, that more shots were exchanged, and that eventually Lieutenant Clayton fell to the ground while Loyd continued to shoot her. The jury also saw many of Loyd's Facebook posts expressing his shrill animus towards law

enforcement, which the State used to support its premeditation argument.

Additionally, a sheriff's deputy testified that before Loyd's arrest, Loyd was inside a house and twice opened the door, tossing a firearm out each time. An FDLE firearm analyst testified that one of the guns thrown from the house was the handgun used by Loyd to kill Sade Dixon, her unborn child, and Lieutenant Clayton. The other gun was used in his attempt to kill Captain Carter.

We conclude that this is sufficient evidence to support the first-degree murder conviction.

## **CONCLUSION**

We affirm Loyd's convictions and sentence of death.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, and FRANCIS, JJ., concur.
LABARGA, J., concurs in result with an opinion.
GROSSHANS, J., recused.
SASSO, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

I continue to adhere to my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), wherein this Court abandoned this Court's

decades-long practice of comparative proportionality review in the direct appeals of sentences of death. For this reason, I can only concur in the result.

An Appeal from the Circuit Court in and for Orange County,
    Leticia J. Marques, Judge
      Case No. 482017CF000826000AOX

Matthew J. Metz, Public Defender, Nancy Ryan, Assistant Public Defender, and Robert Jackson Pearce, III, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant/Cross-Appellee

Ashley Moody, Attorney General, Tallahassee, Florida, and Doris Meacham, Senior Assistant Attorney General, Daytona Beach, Florida,

    for Appellee/Cross-Appellant